STATE of Missouri, Respondent,

v.

Kenneth Eugene HUGHEY, Appellant.

No. 51712.

Supreme Court of Missouri,
Division No. 2.

July 11, 1966.

Norman H. Anderson, Atty. Gen., Jefferson City, Frank P. Motherway, Sp. Asst. Atty. Gen., St. Louis, for respondent.

Frieze & Crandall, Carthage, for appellant.

FINCH, Judge.

Defendant was convicted of manslaughter by culpable negligence under § 559.070 (all statutory references are to RSMo 1959, V.A.M.S.) and sentenced to imprisonment for five years. His motion for new trial was overruled and he appealed.

The evidence on behalf of the State (the only evidence offered) will support the following recital of facts: The body of John Benjamin Carl, a 15-year-old boy, was found at approximately 6:15 p. m., on November 18, 1964, near the middle of the 600 block of South Hall Street in Webb City, Missouri. The body was found near a telephone pole on the west side of the street, lying at the west edge of the pavement, principally on the shoulder. This was just south of the house of the Packer family at 612 South Hall.

The body was discovered by Pearl Williams, who lived at 626 South Hall. Prior to finding the body, Mrs. Williams had been walking from her house to her car when she heard a thud. At the time she thought it was the sound of a fast-moving automobile hitting a dip in Hall Street where it intersects with Garrison Street at the next intersection to the north. Two or three seconds later a car going south on Hall Street passed Mrs. Williams' home going very fast. Mrs. Williams estimated its speed at 75 miles per hour. She said, "It was just a flash in front of me and then it was gone." She did not observe any details about the car or its color or the number of its occupants. The night was dark, misty and rainy and visibility was not very good. She then got in her car and started north and discovered the body of the Carl boy. Mrs. Williams called Mr. Packer, and the police were then notified.

Other neighbors also heard a loud noise at this same time. Mr. Packer described it as like two cars running together and different from the sound of a car hitting the dip at Garrison Street. Mr. Packer was looking after the children and did not go outside until Mrs. Williams came to the

door. Pete Cummings, residing at 610 South Hall, heard a loud boom. Mrs. Cummings thought someone might have hit their parked car and went out and checked it. Gary Compton, 617 South Hall, was watching television and heard a loud noise which sounded like a car hitting the dip but was louder than cars usually made when they did so. Compton went to the window and he saw the taillights of a car going south on South Hall. He also had heard the acceleration of a car after the loud sound and it sounded as though the car had no muffler. He judged the speed of the car at 50 to 60 miles per hour. Burton Clark, 620 South Hall, was watching a newscast and heard what he described as a hollow sound which he estimated as being within 100 feet of his house. He stepped to his front door and when he looked south he saw the taillights of a car going over a rise about a block to the south. The car which Clark had heard sounded like a car without a muffler. Based on the sound, Clark estimated the speed of the car at 55 to 60 miles per hour when it passed his house. C. V. Carl, father of the deceased boy, was at his mother's home at 627 South Hall. His son Benny came from their home at 606 South Hall to tell his father that supper was ready and then started back to their own home. Mr. Carl shortly heard a noise which sounded like a truck had backfired. He then heard a car go by which had excessive muffler noise or a broken pipe. He learned of his boy's death when he started back home shortly thereafter.

All of the witnesses fixed the time of the noise by newscasts which they had heard or were watching and fixed the time as being 6:15 p. m., or thereabouts.

The cause of death was established by testimony as being a severe blow to the neck, fracture of the vertebrae in the neck, a crushing of the cord, and hemorrhage of the brain.

That evening the officers searched the area with a flashlight. They found a pool of blood where the body was lying and the boy's broken glasses were located nearby. Approximately 90 feet north of that point, the officers found a pile of debris on the street consisting largely of dirt which accumulates under car fenders and is knocked off by a sudden blow. There also was some broken glass. One shoe of the Carl boy was found near this debris. The chief of police could not positively identify the source of this debris, but he testified that this was the place where he judged the boy to have been hit.

The following morning, four chrome block letters were found on the west shoulder of South Hall. These were a "C", an "N" and two "L's." Three of the letters were located near where the body was found. The other one was up the street to the north in front of the Cummings house, which was at 610 South Hall. In addition, slivers of paint, some an inch or more in length, were found all of the way from the assumed point of impact to the point where the body was found. These had been washed by the rain off onto the shoulder on the west side.

Defendant and one Ronald Hudnall had met at the Owl Bar in Webb City at about 11:00 a. m., on November 18, 1964. They were there for a time playing shuffleboard and the pinball machine and having a few beers. They next went in Hudnall's car to Watson's place at Oronogo, where they stayed an hour or two, again playing shuffleboard and the pinball machine and drinking several beers. Next, they drove in Hudnall's car to Pete's Bar in Webb City, where they stayed until after 6:00 p. m. Here they played dominoes and drank more beer. The proprietor and his wife, Mr. and Mrs. Eden, came in between 6:05 and 6:10, and defendant and Hudnall left shortly thereafter. Both Edens fixed the time of departure as being between 6:15 and 6:30. Defendant and Hudnall appeared to be hurrying when they left. Hudnall then drove defendant back to the Owl Bar, about three blocks away, where he had left his

car that morning. Defendant told Hudnall that he was going to pick up his girl Mary at the Star Motel in Duquesne, where she worked. He got in his 1956 Lincoln sedan, which Hudnall described as being pink or lavender in color, and drove off. With respect to the condition of defendant when he left Pete's Bar, the proprietor of the bar testified he could tell from the defendant's eyes and looks that he had been drinking and was not sober. Speaking of defendant and Hudnall, he said, "I didn't say they were drunk; I said they were drinking." The proprietor's wife said, "They weren't drunk, but they weren't sober." Hudnall testified, "We both were having a pretty good time and we was, I'd say, feeling pretty good." Hudnall testified that he noticed nothing particularly out of the ordinary in defendant's driving as he drove away from the Owl Bar.

The owner of the Star Motel testified that promptly at 6:30 p. m., on that same evening the defendant arrived to pick up his girl friend, Mary Kettner, who was an employee of the motel. She noticed nothing unusual about defendant during the five minutes he was there.

At about 11:30 p. m., on that same night the defendant reported to the police department of Webb City that his automobile had been stolen from outside the Owl Bar sometime during the evening, where he and his girl friend had been since about 7:00 p. m. The car was described to the police as a white over pink 1956 Lincoln four-door sedan with 1964 Oklahoma License OW 1426, Motor No. 56WA24383. On March 30, 1965, a Lincoln four-door sedan, located under water in the old Daylight mine shaft just north of Webb City, was brought to the surface. It bore Oklahoma 1964 License OW1426 and the Motor number was 56WA-34383. The front of the hood of the Lincoln was caved in and five of the seven chrome block letters normally spelling "LINCOLN" across the front of the hood were missing. Only the "I" and "O" still remained. These block letters were similar to the letters "L", "L", "C" and "N" found on the west

shoulder of the 600 block of South Hall Street on the morning of November 19, 1964. Paint scrapings were taken from the hood of the Lincoln when it was removed from the mine shaft. These, with the paint slivers found on November 19, 1964, on the west shoulder of South Hall Street between where the body was found and the apparent point of impact, were sent to the State Highway Patrol Laboratory at Jefferson City. In addition, the clothes of the deceased Carl boy were sent to the laboratory and paint slivers were found on these clothes. The laboratory technician also discovered some paint on the chrome letter "N" which was found at the scene where young Carl was killed. The technician testified that from a microscopic examination, the use of the spectrograph and some chemical analyses by use of solvents he determined that there were three distinct layers of finish. First, there was a beige undercoat, then a layer of light blue enamel, and finally a layer of pale lavender lacquer. This was true of the samples found at the scene, the samples taken from the hood of the car, the particles found in the victim's clothes, and the paint on the letter "N". The technician determined and testified that all of each type came from the same batch of paint. He further testified that the lavender lacquer was not put on the car at the Ford factory because this was a 1956 automobile and the use of lacquer as a finish on cars did not commence until subsequent to 1957.

There was testimony that the most direct route from the Owl Bar to the Star Motel, located at 7th and Duquesne, was to go east from the Owl Bar to Hall Street and then south on Hall, which eventually becomes Duquesne Street. It was 4.6 miles by that route from the Owl Bar to the Star Motel. Of this distance it was four miles from the 600 block of South Hall to the Star Motel. South Hall was a blacktop street which had some chugholes and was rough but it was heavily traveled. Defendant had been questioned at various times by the police, and he always denied being on South

Hall that evening. He stated that he left the Owl Bar in his car around 6:00 or a little later, then drove to the Range Line, three-fourths of a mile away, then on the highway to the Katz Drug Store, where he turned left to go to Duquesne and the Star Motel. He stated that he stopped and bought gas and he arrived in his car at the Star Motel at 6:30. The difference in mileage by this route was one and one-half to two additional miles.

■ The record on appeal shows that a preliminary hearing was held April 14, 1965. A transcript from the Magistrate Court was filed in the office of the Circuit Clerk on April 22, and on the same day the Prosecuting Attorney filed an information charging defendant with manslaughter. Thereafter, on June 7, the first day of the term, defendant waived formal arraignment and entered a plea of not guilty. The case was set for trial on June 21. On June 16 the transcript of the evidence from the Magistrate Court was filed with the Circuit Clerk. On the day of trial, June 21, defendant filed a motion to dismiss on the ground that the transcript of the testimony had not been filed on or before June 7, in conformity with § 544.390, and was not certified by the Magistrate as required by that section. There was no allegation that the transcript was incorrect or that defendant was prejudiced in any way by the delay. When the motion to dismiss was overruled, the case proceeded to trial. No continuance was requested. Actually, there is nothing in the record before us to disclose if or how the transcript of evidence was certified or identified, but, in any event, we rule this point against defendant on the basis of State v. Banton, 342 Mo. 45, 111 S.W.2d 516, and the cases therein cited. As pointed out in that case, this section of the statutes is not jurisdictional. Its purpose is to assure a fair preliminary examination and to preserve the evidence taken. The transcript on appeal herein discloses that counsel for defendant used this transcript of the preliminary hearing for the purpose of cross-examination. Nowhere is it claimed that defendant did not have the transcript in order to prepare his defense, or that the transcript was inaccurate. Use of it at the trial indicates that defendant was asserting and relying on its accuracy. His motion to dismiss is on the theory that the statutory requirements are jurisdictional. We hold otherwise. The purpose of this statute was served in this case.

■ Defendant next asserts that his motion for judgment of acquittal at the close of the State's case should have been sustained. Several separate assignments are asserted, but these can be considered together. These assignments assert the propositions that there was no evidence to place defendant at the scene where deceased was hit, that his automobile was not placed at the scene at the time of the impact, that defendant was not placed by evidence in his automobile at the time of the impact, that there was no evidence as to the method or mode of operation of the automobile prior to impact with deceased, that there was no evidence as to what deceased was doing just prior to the impact or to negative the possibility of accidental death of deceased, and that for the above reasons there was no evidence of culpable negligence at any time or of any criminal agency of defendant.

In considering this attack on the sufficiency of the evidence to make a submissible case for the jury, the evidence must be viewed in the light most favorable to the State, assuming the evidence of the State and every reasonable inference therefrom to be true. State v. Perkins, Mo., 382 S.W.2d 701 [3]; State v. Taylor, Mo., 324 S.W.2d 643, 76 A.L.R.2d 671. It is our judgment that the evidence was of such character as to authorize the submission of this case to the jury and that the evidence is sufficient to sustain the judgment of conviction.

The jury could have found that defendant's 1956 Lincoln sedan was the one which hit the Carl boy. The automobile pulled out of the waters of the Daylight mine was

the defendant's automobile. The front end of its hood was caved in. Some of the letters spelling the word "LINCOLN" across the front of the hood were missing. Letters corresponding in appearance, size, shape and material to four of the five missing letters were found at the scene where the boy was killed. Three of the letters were found immediately adjacent to his body and the fourth letter nearer to the apparent point of impact. One letter contained some paint which corresponded to paint from the automobile. Paint slivers of varying sizes were found along the street from the point of apparent impact to the point where the body was found, 90 feet away. The paint slivers found on the street, the paint from the clothes of the deceased Carl boy, the paint from the letter "N" found near the scene, and the paint taken from the 1956 Lincoln sedan when it was found, all were analyzed and examined in the laboratory. Each contained three distinct layers of finish—the beige undercoat, the layer of light blue enamel, and the layer of pale lavender lacquer. According to expert testimony, each layer of the various paint particles came from the same batch of paint. The evidence was that these did not come from a car which had been painted with the three coats at the factory because the use of lacquer as a finish was not commenced until after 1957, and this was a 1956 model Lincoln sedan. The coat of pink lacquer had been applied later, making more significant the testimony that the lavender lacquer layer was the same on the paint samples from the four sources.

The evidence and reasonable inferences therefrom also were sufficient to justify the jury in finding that the defendant was the one driving this automobile at the time of impact. Defendant, at around 6:15 p. m., or shortly thereafter, on the day in question, got into this 1956 Lincoln on the parking lot of the Owl Bar and drove off alone for the expressed purpose of going to the Star Motel at the corner of 7th and Duquesne to pick up his girl. At about 6:30 p. m., on the same evening, the defendant, still driving his automobile, arrived alone at the Star Motel, where he picked up his girl Mary. The most direct route between these two places was via South Hall Street, where the Carl boy was hit and killed. There was evidence that the defendant had reported to the Webb City police about 11:30 p. m., on that same day, that his car had been stolen from the Owl Bar parking lot sometime after 7:00 p. m., while he and his girl Mary were in the bar, but this claim of theft of the car related to a time subsequent to the time when this impact occurred. The jury certainly could have found that defendant was driving the car between approximately 6:15 and 6:30 p. m., on that day.

 There was sufficient evidence to justify the jury in finding the defendant guilty of culpable negligence in the operation of his automobile. It was dark and the weather was rainy or misty and visibility was poor. In spite of that fact, the automobile was driven through a populated area at a high rate of speed, fixed by witnesses as somewhere between 50 and 75 miles per hour. The impact caved in the front part of the hood and was of such force as to knock the victim a distance of 90 feet. There was evidence that although the impact was loud enough to be heard by many of the neighbors in the area at a time when they were inside their houses listening to newscasts, the automobile did not stop. The jury could have found that the defendant, although aware of such an impact, continued on at a high rate of speed and left the scene without stopping to check the boy whom he hit. There was evidence that the defendant had been at various taverns between 11:00 a. m., and 6:00 p. m., drinking beer during that period, and that when he left Pete's Bar between 6:05 and 6:10 p. m., he was not sober. This was sufficient evidence to make a submissible case on the question of culpable negligence. We have read the various cases cited by defendant in his brief. They correctly announce the rule that negligence, to be culpable within the meaning of the manslaughter

statute, must be more than ordinary common law negligence and must indicate a reckless or utter disregard for human life. They further hold that a defendant cannot be convicted solely because he has been drinking, but this is a fact, if established, which may be considered along with other facts in determining whether there was culpable negligence. State v. Feger, Mo., 340 S.W.2d 716 [19]; State v. Adams, 359 Mo. 845, 224 S.W.2d 54 [6]. Numerous cases, including several cited, have held that evidence of conduct no more flagrant than here was sufficient to make a submissible case under the manslaughter statute. See State v. Simler, 350 Mo. 646, 167 S.W.2d 376; State v. Adams, Mo., supra; State v. Millin, 318 Mo. 553, 300 S.W. 694; State v. Feger, Mo., supra; State v. Duncan, Mo., 316 S.W.2d 613; State v. Daugherty, Mo., 320 S.W.2d 586. Some of these cases were reversed and remanded on account of trial error, but the opinion in each case held that the evidence was sufficient to make a submissible case on the question of culpable negligence.

Defendant makes the point that there is no evidence to show what the deceased Carl boy was doing immediately prior to the impact or to show that this was not an accidental death. It is true that there is no direct evidence as to what the deceased boy was doing, any more than there is eyewitness evidence as to defendant's presence or the method of operation of his automobile. Such direct evidence is not necessary. The fact that the driver of the car, after hitting the boy and knocking him 90 feet, continued on at a fast rate of speed and did not stop to check as to the boy's condition, is some evidence that this occurrence was not an accident. If it had been, the driver could have been expected to stop. In our judgment, the jury was justified, under all the facts and circumstances in evidence and the inferences therefrom, in concluding that this was not an accident and that the defendant was guilty of culpable negligence. His conduct did show a reckless disregard for human life.

■ Defendant next complains of error in the admission of testimony of Mrs. Williams that the car she saw passing at about 6:15 p. m., was being driven at a speed of 75 miles per hour. She expressed this by saying that the speed limit was 25 miles per hour and that the car was going three times that speed. Defendant cites and relies on Chance v. Atchison, T. & S. F. Ry. Co., Mo., 389 S.W.2d 774. In the Chance case the witness did not testify as to his judgment of speed but sought only to testify that the speed was "excessive." The court held that this was a conclusion and as such was inadmissible as an invasion of the province of the jury. However, the opinion also recognizes that a person, when qualified, may be permitted to testify concerning the speed of a vehicle based on his observations. Mrs. Williams testified that she had been driving a car since 1921 and said that she had had experience in estimating speeds from her own experience in driving. That made her testimony admissible. It is true that on cross-examination she stated that she was not a good judge of speed, and gave some answers which might affect the weight the jury would give to her testimony as to speed, but this cross-examination would affect only the credibility of her testimony and not its admissibility.

■ Defendant also complains as to the testimony of witness Clark estimating the speed of the car at 55 to 60 miles per hour as it passed his house at 620 South Hall. No objection was made to this testimony at the time. A motion to strike, made at the close of his testimony, was not sufficient to raise or preserve the question. We find no error here. We also note that a third witness, Compton, testified without objection to a speed of 50 to 60 miles per hour.

■ Complaint also is made in the refusal of Instructions Nos. 14, 15 and 19, which were requested by defendant, but nothing is preserved for review as to any of these instructions. The motion for new trial and the points relied on merely state

that the court erred in refusing these particular numbered instructions, without assigning any reason whatsoever therefor. This is wholly insufficient. State v. Butler, Mo., 353 S.W.2d 698; Criminal Rule 27.20, V.A.M.R.

■ Finally, defendant complains of the giving of Instruction No. 5. That instruction was as follows:

"The Court instructs the jury that the defendant, Kenneth Eugene Hughey, is charged with Manslaughter, that is, by causing the death of John Benjamin Carl, by the culpable negligence of him, the said defendant, Kenneth Eugene Hughey.

" 'Culpable negligence' is the omission on the part of one person to do some act under given circumstances which an ordinarily careful and prudent person would do under like circumstances, showing on the part of such person a reckless disregard for human life or limb, or the doing of some act under given circumstances which an ordinarily careful and prudent person under like circumstances would not do, showing on the part of such person a reckless disregard for human life or limb, by reason of which omission or action another person is directly endangered in life or bodily safety.

"The Court instructs the jury that to make negligent conduct culpable negligence or criminal, and to make it manslaughter, if death is caused by it, the particular negligent conduct of the defendant must be of such reckless or wanton character as to indicate on his part an utter indifference to the life of another who is killed as the result thereof. It is only from such culpable negligence that a criminal intent may be shown, and in the absence of such criminal intent the crime of manslaughter has not been proved.

"If, therefore, you find and believe from the evidence in this case, beyond a reasonable doubt that the defendant, Kenneth Eugene Hughey, on or about the 18th day of November, 1964, in the County of Jasper and State of Missouri did recklessly and feloniously with culpable negligence drive the automobile mentioned in evidence with great force and violence against the person of John Benjamin Carl and as a result thereof the said John Benjamin Carl received injuries to his head and body and as a result of said injuries the said John Benjamin Carl died, you will find the defendant guilty of manslaughter and assess his punishment at imprisonment in the State Penitentiary for not less than two years nor more than ten years, or by imprisonment in the County jail for not less than six months, or by a fine not less than $500.00 or by both a fine not less than $100.00 and imprisonment in the County jail for not less than three months, and unless you find the facts so to be you will acquit the defendant.

" 'Felonious' as used in this instruction means wickedly and against the admonition of the law, that is unlawfully."

The complaint made in the motion for new trial and in points relied on is that the court failed to hypothesize the actions of the defendant which would constitute culpable negligence and that it told the jury that they could find the defendant guilty from the mere fact that deceased was struck with great force and violence. These objections are not well taken. The instruction did hypothesize the actions of the defendant which the jury must find, and further required the jury to find that these were done "recklessly and feloniously with culpable negligence." The instruction properly defines "culpable negligence" and "felonious." The jury was required to find that the car was driven by defendant against the person of deceased with great force and violence and was done recklessly and feloniously with culpable negligence. The jury was instructed further that in order to convict they must find that defendant drove the car wickedly and unlawfully, omitting to do some act under those circumstances which an ordinarily careful and prudent person under like circumstances would have done, or doing an act which such careful and prudent person would not have done, showing by such omission or act a reckless

disregard and utter indifference for human life or limb, by reason of which the deceased Carl boy was endangered and received injuries resulting in his death. This was a sufficient instruction. See State v. Beckham, 306 Mo. 566, 267 S.W. 817 [4]; State v. Carter, 342 Mo. 439, 116 S.W. 21 [1]; Raymond, Missouri Instructions, Vol. 2, §§ 5872, 5873. The case of State v. Duncan, Mo., 316 S.W.2d 613, cited by defendant, says nothing to cause us to reach a contrary conclusion. Actually, Instruction No. 1 from that case to which defendant refers was held not to be prejudicially erroneous, when considered with other instructions, but the court stated that the instruction did not have its approval. The Duncan opinion does not state that hypothesization greater than that contained in Instruction No. 5 is required.

The judgment is affirmed.

All of the Judges concur.