**STATE of Missouri, Plaintiff/Appellant,**

v.

**Timothy Neal DAVIS,
Defendant/Respondent.**

**No. 60109.**

Missouri Court of Appeals,
Eastern District,
Division One.

Feb. 11, 1992.

William L. Webster, Atty. Gen., Millie Aulbur, Asst. Atty. Gen., Jefferson City, for plaintiff, appellant.

Bradford J. Kessler, St. Louis, David R. Crosby, Margulis & Grant, Clayton, for defendant, respondent.

REINHARD, Presiding Judge.

The State appeals the grant of defendant's motion for a judgment of acquittal notwithstanding the verdict of the jury on a charge of first-degree sexual abuse. We reverse and remand.

Defendant was charged with one count each of forcible rape, § 566.030, RSMo 1986; forcible sodomy, § 566.060, RSMo 1986; and first-degree sexual abuse, § 566.100, RSMo 1986. He was found not guilty on the forcible rape and forcible sodomy charges but convicted of first-degree sexual abuse.[1] He moved for a judgment of acquittal notwithstanding the verdict on that count. The trial court granted the motion. This appeal followed.

■ To determine whether to grant defendant's motion for judgment of acquittal notwithstanding the jury's verdict, the trial court was required to view the evidence and inferences in the light most favorable to the verdict and disregard all contrary evidence and contrary inferences. *State v. Couch,* 793 S.W.2d 599, 601 (Mo.App.1990). With the evidence so viewed, the trial court was then required to determine whether the evidence was sufficient for 12 reasonable persons to have found the defendant guilty as charged beyond a reasonable doubt. *Id.*

The State's point on appeal contends:

The trial court erred in granting respondent's motion for judgment of acquittal notwithstanding the verdict of the jury as to first-degree sexual abuse because the evidence presented by the state, viewed in the light most favorable to the verdict, was sufficient to sustain that conviction in that the jury could reasonably infer that respondent subjected [victim] to sexual contact without her con-

sent when he forced her against his truck, ripped open her shirt and fondled her breasts through her bra.

■ In order to find defendant guilty of sexual abuse in the first-degree, the jury was required to find that he subjected victim (to whom he was not married) to sexual contact without her consent by the use of forcible compulsion. Section 566.100, RSMo 1986.[2] The State's evidence showed the following:

On November 9, 1989, victim worked the 4:00 p.m. to 12:00 a.m. shift at Walgreens drug store. After work she went to Shenanigan's, a neighborhood bar in Florissant, to meet a female friend (Linda). Shortly after her arrival at the bar, Linda told victim that defendant was staring at them. The staring made Linda, a psychiatric nurse, uncomfortable in that it reminded her of one of her psychiatric patients. Victim urged Linda to ignore him.

When the bartender announced "last call" for drinks, defendant approached the two and asked to buy them a drink. They accepted. Defendant asked the women if they had plans after they left the bar. The women said they were going home. The trio also talked about work. Defendant was pleasant with the women until victim told him she had to cross a picket line everyday to get to her workplace. Defendant said he's dropped steel on people for crossing picket lines. He also said he was on his twenty-second rum and coke.[3]

During the conversation, defendant dropped his drink, which spilled on Linda. Linda went to the restroom while victim and a waitress cleaned up the broken glass. Defendant apparently left while this was going on as victim did not see him again inside the bar.

When the women left the bar, they saw defendant walking towards the door from the parking lot area. Linda said, "Let's

---

1. Victim testified that the sexual abuse took place prior to entering the vehicle where the alleged rape and sodomy took place.

2. This statute was amended in 1990. However, the offense took place on November 10, 1989, so the old statute is controlling.

3. At trial, defendant testified that he had actually had between ten and fifteen rum and cokes that night.

hurry up and get to the car because here he comes." Her car was closest. Defendant asked them if they wanted to party. They said "no," they had to get home. Defendant followed them to Linda's car. Victim asked him if the red pick-up truck parked next to Linda's car was his. He said no, he was going to steal it. The women did not take this remark seriously. He then whispered in Linda's ear that he would like her phone number. She said "no" and told him she was happily married. Linda then told victim to get in her car and she would drive her to victim's car which was 20–30 feet away. Victim said she could walk; Linda insisted, "Get in anyway." As she attempted to do so, defendant stood in front of her and blocked her "a little bit." Linda felt this was "more in play" than a serious effort to stop her, "but there wasn't any way she could get around him either." After a couple of minutes, victim was able to get around him and into Linda's car. Victim did not feel threatened by defendant at this point. She felt he was "just a guy trying to pick up a girl."

Linda drove victim to her car. By this time, victim no longer noticed where defendant was and the women discussed other subjects. Linda waited for victim to warm up her car for a minute or two, but victim waived for her to go ahead and go since she knew Linda was almost out of gas.

After victim left the parking lot by making a turn onto Howdershell, she noticed defendant's truck in her rear-view mirror. She turned on her turn signal and he did, too. She made a right turn onto Charbonier and defendant did the same. Victim immediately turned on the first street (Albert) to see whether she was being followed. When defendant followed, victim pulled over "to see what he wanted." Defendant pulled over behind her. Victim did not want defendant to find out where she lived. Leaving the motor running, victim left the vehicle intending to walk back to defendant's truck and "tell him to go on his merry way so I could go home." She still did not consider him a threat at that time.

Before she said anything, however, defendant got out of his truck and asked her what her problem was. She responded that she didn't know what he was talking about. Defendant tried to kiss her. She pushed him away and tried to get into her car. Defendant grabbed her jacket and pushed her against her car. Defendant is nine inches taller than victim. Defendant admitted to police that victim looked to defendant to be frightened.[4] He then grabbed her shirt and ripped it open. After ripping the shirt open, defendant touched victim's breasts. He said he was going to "f[——]" her. She said "no." He then grabbed her hair and pulled her head down towards him and said she "was going to suck him then." At this point victim noticed his license plate, although she did not memorize it at that time.

After victim said "no," defendant "got mad" and pushed her between the vehicles and her back up against the truck. He then put his hands down her pants and felt her genital area. She pushed him away.

As she started to walk away, he grabbed her by both arms and began pushing her down and saying he "was going to f[——]" her. She said, "No." He said, "Why?" She said, "Because I'm not on anything," meaning birth control. He said he didn't care. She said, "I do" and asked him if he would use a condom. He said, "Yes." She told him she had one in her trunk. Victim testified that she was afraid she would "get AIDS or get pregnant." She also testified that she told defendant that she had gotten pregnant before and did not want it to happen again.[5] Victim testified that she had to get the keys out of the ignition to open the trunk and had hoped that defendant would stay in the back so she could get into her car and leave.

---

**4.** Defendant claimed that this statement was coerced, an issue we discuss below. However, this statement was evidence favorable to the verdict presented during the state's case through the testimony of the police officer.

**5.** Victim was 22 years old at the time of the incident at issue at trial and had a seven year old son.

Instead, he grabbed her and walked with her holding her by the hair to the ignition and then to the trunk. After removing a packaged condom from a box of condoms she kept in the trunk,[6] defendant told her to get in the back seat. Victim said she had to leave.

However, victim and defendant subsequently engaged in acts of oral sex upon each other and at least attempted intercourse in the back seat of the car. Victim testified she was forced and that defendant was able to penetrate her only after half an hour or so of oral sex. Defendant testified the acts were consensual and that he was too drunk to achieve an erection so that no penetration took place.

Following these acts, defendant told victim he thought she was a cop because she had handcuffs on her rear-view mirror.[7] She replied that she wasn't and said, "I'll show you my I.D. if you show me yours." Defendant refused, saying she was a cop and that he was wanted for assault in the third degree. She again assured him that she was not a cop and asked to see his I.D. Defendant took the handcuffs off the rearview mirror, asked her about them, and put them back.

Sometime prior to this, defendant asked her to turn on the light and picked his wallet up off the floorboard.[8] He then said, "Here, you show me yours and I'll show me mine," referring to the I.D.'s although victim testified that they never actually showed each other the I.D.'s.

After replacing the handcuffs, defendant grabbed a pen out of the cassette holder and turned off the light. He then asked victim for her phone number. She testified that she gave him only the last four digits of her number at first but defendant became angry and insisted that she repeat the phone number over and over again. Victim testified at this point she gave him the entire correct phone number because it was the only one she could think of. Defendant then had her write it on his hand with her name above it.[9] Defendant said he was going to call her when he got home. Victim told him "no, because I couldn't have calls after nine." [10]

Victim then exited the car with the pen, walked to the back of the car and wrote down the license plate number of his truck on her hand. After a couple of minutes, defendant got out of the car and told her she was "going to suck him again" but she told him, "No, just go home and call me" because she "just wanted to get rid of him." She then looked at his plate again "so I could remember and I wrote it down clearly on my hand ..." [11] She then got in her car and drove home, leaving as defendant urinated next to his truck.

After she got home, victim called her boyfriend as she always does. He told her to wake her mother [12] and go to the hospital, which she did.

The prosecution entered into evidence the shirt victim wore, which had a button missing. Victim testified the button was ripped off the shirt when defendant first approached her outside the car.[13] The prose-

6. Victim testified she kept the box of condoms in the trunk because she was sexually active with her boyfriend and did not carry a purse.

7. Victim testified the handcuffs belonged to her seven year old son and were purchased at a carnival supply store for three dollars.

8. Victim testified that she kept a pillow in the front seat because she was under a license restriction that required her to have a cushion because she was 5'3" and needed it to see out the windshield properly.

9. A photograph of defendant's left hand with the victim's name and phone number on it was admitted into evidence.

10. Defendant called victim's house the next morning at 9 a.m. and was told by victim's mother that she was not at home.

11. Testimony indicated that the police traced defendant from the license plate information supplied by victim. An exhibit showed the number written on her hand. Victim was off by one digit.

12. Victim lives with her mother and victim's seven year old child.

13. The button was the fourth one down or the second from the bottom. Victim testified she usually wore the top two unbuttoned. Regarding the third button down, she testified, "But if I

cution also entered into evidence victim's bra, which she testified defendant grabbed and ripped in half between the cups while they were inside the car. In addition, the prosecution entered into evidence her pants, along with a button she testified came off of them when he put his hands down her pants between the truck and the car.[14] This button was subsequently found at the scene (on Albert Street) by the police. Testimony indicated that defendant's fingerprints were found on victim's handcuffs and that an unused condom was found on the rear console of her car.

The examining physician testified that his examination, conducted 2½ hours after the incident, revealed that victim's breasts were bruised in three places. Her right cheek was swollen and her left cheek was red. Her outer genitalia were swollen and red.

Victim initially did not mention the portions of the incident involving the condoms or the phone number to police. After being given his Miranda warnings, defendant gave a written statement denying the charges.[15] He was taken to see the chief of police. Sometime after this meeting, having been readvised of his Miranda rights in writing, he gave a written confession to all of the charges[16], which was admitted into evidence at trial.[17]

The jury convicted defendant of first-degree sexual abuse but acquitted him of forcible rape and forcible sodomy. It assessed his punishment at one year of imprisonment plus a fine in an amount to be determined by the court.

Defendant filed a motion for judgment of acquittal notwithstanding the verdict of the jury. It alleged two grounds: first, that the State did not make a submissible case; and second, that the verdicts of not guilty as to the forcible rape and forcible sodomy counts were inconsistent with a finding of guilty as to the first-degree sexual abuse count. The judge granted defendant's motion, finding that he disbelieved the victim and that therefore a submissible case was not made. He also found the verdicts to be inconsistent.

In addition, the court apparently relied upon a statement made outside the presence of the jury by one of the jurors. After the testimony of victim and her friend Linda, one of the jurors came forward and said that he realized that he may have once talked to victim. The "girl" he had spoken with had the same first name, lived on Charbonier[18], worked at Walgreens and was the same age as victim. He didn't "know her personally per se," but his roommate had once stopped to help her get gas after she had gotten off work one morning "and they began being friend-

get jolted or something, sometimes it comes undone."

14. The button was missing on the pants just above the zipper.

15. Defendant's original story was that he had pulled up next to victim's car at the stoplight at Howdershell and Charbonier. Victim's window was rolled down and she beckoned with her hand for him to follow her. All the subsequent acts were consensual. According to the police officer's testimony, "he said he was a little rough with her but she really didn't seem to mind."

16. Defendant said the ripping of the clothes took place inside the car, although he "intimidated" her by "rough handling" outside. According to the police officer's testimony, "He said that [victim] looked to him to be frightened" after he grabbed her by the biceps and before he forced her into the car and had sexual contact with her.

17. Defendant testified this confession was coerced because the chief of police threatened to have him indicted. Defendant was released after giving the written confession. The police testified that this was because they could not obtain a warrant at that time (after 5 p.m. on a Friday/holiday) and they were constitutionally prohibited from holding defendant more than 20 hours without one. Testimony showed that an alleged oral statement made by the defendant confessing to the crimes was not recorded by the police, although they had audio and video recording equipment available. Defense counsel emphasized on cross-examination of the police officer who testified and in closing argument that the later written statement contained numerous examples of "cop speak" which did not comport with defendant's usual speech patterns as illustrated by a comparison with his first written statement and took less time to complete although it was lengthier.

18. Victim does not live on Charbonier but testified that she lived near there.

ly after that." He said he was not certain it was the same person. He did not realize the problem during voir dire because he did not know the woman's last name. The juror was excused and replaced by an alternate.[19]

As we noted above, in ruling on a motion for judgment of acquittal, the court must view the evidence in the light most favorable to the verdict, and, under that light, determine whether the evidence is sufficient to support the verdict. Thus, the court is to assume the truth of the evidence offered by the State. *State v. Hughey,* 404 S.W.2d 725, 729 (Mo.1966). It is apparent that the trial judge did not do so here. While no useful purpose is served in detailing the judge's reasoning, it is clear from the record that he weighed the evidence, as he was not permitted to do, rather than viewing the evidence and permissible inferences in the light most favorable to the state, as he was required to do. *Id.*

■ On appeal, we similarly must determine whether the evidence is sufficient to support a conviction by viewing the evidence and all reasonable inferences therefrom in the light most favorable to the verdict, disregarding all contradictory evidence and inferences. *State v. Nelson,* 818 S.W.2d 285, 288 (Mo.App.1991). We look only to whether there was sufficient evidence from which reasonable persons could have found defendant guilty as charged. *Id.* Questions of credibility of witnesses and the effects of conflicts or inconsistencies in the testimony of any witness are questions for the jury. *Id.* It is within the jury's province to believe all, some, or none of any witness's testimony in arriving at its verdict. *Id.* The testimony of one witness may be sufficient to sustain a conviction even if the testimony is inconsistent. *Id.* In cases involving sexual offenses, the victim's testimony will ordinarily sustain a conviction, even if uncorroborated. *Id.* See also *State v. Hill,* 808 S.W.2d 882, 890–91 (Mo.App.1991); *State v. Dee,* 752 S.W.2d 942, 944 (Mo.App.1988).

Defendant's motion for judgment of acquittal notwithstanding the verdict did not specifically raise the corroboration issue. However, on appeal his principal argument as to why the State's case was not submissible is that the so-called "corroboration rule" was triggered and not satisfied. This exception to the general rule that corroboration of the victim's testimony is not required is thought by some to apply where "there are gross inconsistencies and contradictions which bear on a proof essential to the case" and to apply only to cases involving sexual offenses. *Nelson,* 818 S.W.2d at 289; *State v. Koonce,* 731 S.W.2d 431, 439–40 (Mo.App.1987).

■ Recently, in *Nelson,* 818 S.W.2d 285, we reviewed the history of the corroboration rule. We concluded that if such a rule still exists, it is triggered only by inconsistencies in the victim's statements and does not apply to inconsistencies between the victim's statements and those of others. *Id.* at 289; *State v. Daniel,* 767 S.W.2d 592, 593 (Mo.App.1989).

Here, victim's statements as to what occurred outside the car, prior to victim and defendant's entry into the car are entirely consistent and are sufficient to make a submissible case of first-degree sexual abuse. See *State v. Young,* 801 S.W.2d 378, 380 (Mo.App.1990) (attempted sodomy). Victim testified that defendant ripped open her shirt and fondled her breasts and that he broke the button off her pants when he stuck his hand down them to feel her genital area. She testified that these sexual contacts were the result of physical force and took place without her consent. Thus, corroboration was not required. In addition, the bruises on victim's breasts, the button to her pants found at the scene and outside the car, the condition of her clothing, and defendant's statements to police at least partly corroborate her testimony.

■ We also find that the jury's verdict of guilty on the sexual abuse count and

---

**19.** Defendant made no complaint regarding the juror in either his after-trial motion nor on appeal and consented to his removal from the jury. Since the statements of the juror were not in evidence, it is obvious that they could not support the trial court's ruling.

not guilty on the rape and sodomy counts is not a valid ground for the trial court's ruling. Inconsistent verdicts among several charges require reversal only if there is insufficient evidence to support the jury's finding of guilt. *State v. Clemons*, 643 S.W.2d 803, 805 (Mo. banc 1983); *State v. Cross*, 699 S.W.2d 51, 52 (Mo.App.1985). Each count of the charges must be regarded separately. *Cross* at 53.

In *State v. Doney*, 622 S.W.2d 227 (Mo. App.1981), we rejected a defendant's appeal of an allegedly inconsistent verdict which convicted him of rape and one count of deviate sexual intercourse but found him not guilty of a second count of deviate sexual intercourse. We stated:

> While we acknowledge that all the evidence had a single source [the victim], we do not believe that reversal is required ... [citation omitted]. "However much the jury's conclusion may tax the legally trained's penchant for consistency, the law is clear that inconsistent verdicts among the varied charges of a multi-count indictment are not self-vitiating.... [J]uries frequently convict on some counts and acquit on others, not because they are unconvinced of guilt but simply because of compassion, and compromise." *State v. McCall*, 602 S.W.2d 702, 708[22] (Mo.App.1980).

*Doney* at 229, *cited in Cross*, 699 S.W.2d at 54.[20]

Judgment reversed and remanded. Upon remand, the trial court is instructed to reinstate the conviction of defendant for sexual abuse in the first degree and to sentence defendant.

GARY M. GAERTNER and CRANE, JJ., concur.

---

**20.** In addition, the jury's verdict in this case was not necessarily inconsistent for the reasons cit- ed by the prosecutor in her exchange with the trial judge.